**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

TAMAR BROWN,                        :
                                    :
          Plaintiff,                :
                                    :
     v.                             :        CASE NO.: 7:23-CV-00068 (WLS)
                                    :
SOUTHERN SENIOR ASSOCIATES,         :
LLC, d/b/a THE RESIDENCE AT         :
OAK GROVE, a Foreign Limited        :
Liability Company,                  :
                                    :
          Defendant.                :
                                    :

## ORDER

Before the Court is Defendant Southern Senior Associates LLC's ("Defendant SSA" or "SSA") Motion for Summary Judgment (Doc. 41). After review, the Motion is granted. SSA is not liable as a joint employer or a successor for the alleged employment torts of PLC. Hence, only alleged discrimination which occurred after SSA assumed management of Oak Grove is relevant. Plaintiff's discrimination claims fail because her proffered comparator under *McDonnell Douglas* is not similarly situated, and she cannot otherwise show intentional discrimination. Plaintiff's retaliation claims fail because her complaint to Jordan Cook was not protected activity. And, to the extent asserted, Plaintiff's hostile work environment claim fails because the environment at Oak Grove was not objectively hostile. Consequently, the Court grants summary judgment on all claims.

## I. RELEVANT PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit in June 2023. The Amended Complaint names two defendants: SSA and now-dismissed-defendant PLC Employee II, LLC ("PLC"). (*See generally* Doc. 11). Plaintiff asserts claims under 42 U.S.C. § 1981 for race discrimination and retaliation against both SSA and PLC. (Doc. 11 ¶¶ 46–82). Plaintiff also asserts Title VII claims against SSA. (*Id.* ¶¶ 46–61).

PLC previously filed a Motion to Dismiss (Doc. 17). The Court granted that Motion, dismissing Plaintiff's § 1981 claims against PLC—the only claims against it. PLC was therefore

1

dismissed from the lawsuit. The Court made no findings on Plaintiff's claims against SSA which did not file its own motion to dismiss. After the Court resolved PLC's Motion to Dismiss, the only claims that remained were Plaintiff's discrimination and retaliation claims against SSA. (*See* Doc. 27 at 11); (Doc. 11 ¶¶ 46–82).

SSA filed the instant Motion for Summary Judgment (Doc. 41) on September 11, 2024.[1] Plaintiff filed her Response (Doc. 44) on October 11, 2024. SSA did not reply. SSA's Motion for Summary Judgment is thus fully briefed and ripe for ruling.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). [2]

---

[1] SSA filed its Memorandum in Support (Doc. 42) of the Motion for Summary Judgment in a separate docket entry later on September 11, 2024. A notice of deficiency was issued by the Clerk. The Court nevertheless considers the Memorandum in Support (Doc. 42).

[2] Local Rule 56 requires the movant for summary judgment to attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute. M.D. Ga. L.R. 56. The respondent shall attach to its response a separate statement of material facts to which respondent claims there exists a genuine dispute. *Id.* The respondent shall also respond to each of the movant's numbered material facts. Here, SSA complies with Local Rule 56. But, although Plaintiff responds to SSA's statement of undisputed facts, she does not attach a statement of material facts about which she contends there is a genuine dispute. Plaintiff has thus failed to comply with Local Rule 56.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted). To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587–88; *Allen*, 121 F.3d at 646. Yet the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### III.   FACTUAL BACKGROUND

Plaintiff, a Black woman, is the former Executive Director of an assisted living community located in Thomasville, Georgia: The Residence at Oak Grove. (Doc. 42-1 ¶¶ 1, 17–18).[3] While working at Oak Grove, Plaintiff grew concerned about several incidents of what she perceived to be discrimination. (Doc. 42-1 ¶¶ 24, 27, 30, 34, 48, 52). Plaintiff alleges SSA terminated her in retaliation for complaining of this discrimination. (Doc. 42-3 at 153).

#### A.    PLC Management of Oak Grove

PLC hired Plaintiff in August 2020. (Doc. 42-1 ¶ 18). Matthew Price owns Oak Grove, but he delegates management of the property to outside management companies. (*Id.* ¶¶ 2–4). When Plaintiff was hired, PLC managed Oak Grove. (*Id.* ¶¶ 3, 18). So PLC employed Plaintiff initially. (*Id.* ¶ 18).

As the sole Executive Director, Plaintiff oversaw the operations of Oak Grove. (Doc. 42-3 at 52). She directly supervised the directors of each department. (*Id.* at 52–53). Plaintiff initially reported directly to Christopher Gill—the PLC Regional Director of Operations. (Doc. 42-1 ¶ 21). But after Mr. Gill resigned in December 2020, Plaintiff reported to Mark Starks, the PLC Vice President of Operations. (*Id.*)

Plaintiff points to three incidents of alleged discrimination during PLC's tenure. (*See* Doc. 44 at 3–4). The first occurred in December 2020. (Doc. 42-1 ¶ 24); (Doc. 44 at 3). Plaintiff asked Heath Reneau, a White employee and the Maintenance Director at the time, to hang a plaque near the concierge desk. (Doc. 42-3 at 64). As Mr. Reneau worked, he muttered to himself, "I am tired of this black bitch telling me what to do." (Doc. 42-3 at 64–65). Unbeknownst to Mr. Reneau, Plaintiff overheard. (*Id.*) Yet Plaintiff never reported the comment to management. (Doc. 42-1 ¶ 26). Nor did she take any personnel action against Mr. Reneau for the comment. (*See* Doc. 42-3 at 66–67). PLC terminated Mr. Reneau for unrelated reasons soon after. (*See id.* at 76).

The second incident was also in December 2020. (Doc. 42-1 ¶ 27); (Doc. 44 at 3). Lindsay Clay—who is White—was the Business Manager at the time. (Doc. 42-1 ¶ 27). She

---

[3] If a fact is undisputed by Plaintiff, the Court relies on SSA's Statement of Undisputed Material Facts for relevant propositions.

complained to a coworker that Plaintiff was "hiring all black people." (Doc. 42-3 at 99). The coworker, Tracy Smith, memorialized Ms. Clay's comment in a letter to PLC management. (Doc. 44-2 at 9).

The third incident occurred when PLC "thwarted" Plaintiff's role in hiring personnel. (Doc. 44 at 4). When the Director of Sales, Christina Heath, resigned, Oak Grove posted a vacancy. (Doc. 42-3 at 75). Although Plaintiff contributed to the candidate review process, Mr. Starks and Vialis Rodriguez were also heavily involved. (*Id.* at 79). Plaintiff testified that this was unusual. (*Id.*) Before Plaintiff could make a final hiring recommendation, she discovered via email that Mr. Starks and Mr. Rodriguez had promoted Ms. Clay to Director of Sales. (*Id.* at 75); (Doc. 42-1 ¶ 34). Plaintiff believes that Ms. Clay was not qualified compared to other candidates—particularly because she lacked sales experience. (*Id.* at 77).

Throughout PLC's tenure, Ms. Clay and Christina Reneau were "racially insubordinate[.]" (Doc. 44 at 3–4); (Doc. 42-3 at 106). Most often, this insubordination involved complaining directly to PLC management or Matthew Price about Plaintiff—circumventing Plaintiff in the chain of command. (Doc. 42-3 at 106, 111). Plaintiff believes Ms. Clay and Ms. Reneau complained because they "had a problem with - - taking directives from [a] black female." (*Id.* at 111).

### B.    Transition between PLC and SSA

In the summer of 2021, Mr. Price grew unhappy with PLC's leadership and terminated its management contract. (Doc. 42-3 at 41); (Doc. 42-1 ¶ 4). Mr. Price replaced PLC with Defendant SSA, "a local third-party property management company[.]" (Doc. 42-1 at 4). Management transferred on October 1, 2021. (Doc. 41-1 ¶ 12). SSA offered all Oak Grove employees the opportunity to retain their current positions through the transfer. (Doc. 42-2 ¶ 11). Plaintiff continued as Executive Director under SSA's management (*See* Doc. 42-2 at 25–77). She submitted new-hire paperwork on September 6, 2021. (*Id.* at 77). But Plaintiff received paychecks from SSA only after the official transition. (Doc. 42-2 ¶ 4). All new hires, including Plaintiff, started on a 90-day probationary period. (Doc. 42-3 at 45–46).

Once SSA assumed control, Plaintiff reported to entirely new upper-level management. (*See* Doc. 42-2 ¶ 8). She reported to SSA's Divisional Director of Operations: Jordan Cook.

5

(*Id.* ¶ 17). Generally, her duties remained the same. (*See e.g.*, Doc. 42-2 ¶ 15). But she was also responsible for implementing SSA's new policies to ensure Oak Grove "function[ed] the [SSA] way." (Doc. 42-3 at 135).

### C.    SSA Management of Oak Grove

Plaintiff identifies two, alleged incidents of discrimination during SSA management. (Doc. 44 at 3–4). The first occurred soon after the transition, in October 2021. (Doc. 42-3 at 89–92). Plaintiff first met Jordan Cook a month earlier when he visited Oak Grove in anticipation of the transition. (*Id.* at 92). At the time, Plaintiff wore her hair in braids. (Doc. 42-3 at 89–90). But soon after, Plaintiff got a "silk press cut." (*Id.* at 90). The next time Mr. Cook visited, he remarked on the change, saying: "I like your hair better like that. That's more the look." (*Id.* at 92). Although Plaintiff felt humiliated, (*id.* at 92–93), she did not report the comment to SSA. (Doc. 42-1 ¶ 50).

The second incident took place in November 2021. (Doc. 42-1 ¶ 52). As Plaintiff was discussing community programming with the Director of Activities, Ms. Clay walked into Plaintiff's office and called her a "whore." (*See* Doc. 42-3 at 81–84). In response, Plaintiff admonished Ms. Clay saying: "[t]hat's very disrespectful. . . . [T]hat is some type of discrimination or a racist comment." (*Id.* at 83).

Soon after, Plaintiff reported the "whore" comment to Mr. Cook. (*See* Doc. 44-3 at 32–33). She told him "that [she] felt discriminated against because of - - [her] race as a black American female," and she "asked him to address it." (*Id.* at 86). Mr. Cook promised to address the comment. (*Id.*) After the meeting, Mr. Cook sent a letter to SSA's HR Department documenting Plaintiff's report—although Plaintiff disputes the letter's accuracy. (Doc. 42-2 ¶ 23); (*id.* ¶ 26); (Doc. 44-1 ¶ 64).

In late-December 2021, Mr. Cook and Cindy Dotson visited Oak Grove to terminate Plaintiff. (Doc. 42-3 at 95). During the termination meeting, Mr. Cook and Ms. Dotson presented Plaintiff with a memorandum which noted deficiencies in her performance. (*Id.*) These deficiencies included a lack of leadership ability, poor communication and interpersonal skills, a failure to master new management processes, and a failure to meet expectations for financial accountability. (Doc. 42-2 at 22). The memorandum also noted that Plaintiff retaliated against team members "who voiced concerns regarding her behaviors." (*Id.*) Plaintiff

denies that these alleged deficiencies accurately reflect her performance, (*see id.* at 140–52), and believes that SSA's asserted reasons for terminating her were pretextual. (*Id.* at 159). Indeed, Plaintiff maintains that her performance as Executive Director was "[a] 10 out of 10[.]" (*Id.* at 54).

## IV.  DEFENDANT SSA'S MOTION FOR SUMMARY JUDGMENT

Defendant SSA moves for summary judgment on each of Plaintiff's remaining claims. (Doc. 42 at 2). SSA makes four arguments for summary judgment. The Court addresses each in turn.

### A.  Liability for Alleged PLC Discrimination

At the outset, SSA contends that the Court should exclude any incidents of alleged discrimination that occurred before October 1, 2021, from its analysis. (Doc. 42 at 2). SSA reasons that it should not be liable for PLC's employment torts because SSA is not sufficiently related to PLC. (*Id.* at 3–5).[4] As both Parties recognize, this issue has significant implications for Plaintiff's claims, because nearly all of the complained-of-discrimination occurred during PLC management.

Generally, to be liable for employment discrimination under Title VII or 42 U.S.C. § 1981, a defendant must be an "employer" within the meaning of those statutes. *Hendon v. Kamtek, Inc.*, 117 F. Supp. 3d 1325, 1328 (N.D. Ala. 2015) (citing *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1359 (11th Cir. 1994); *Fountain v. Metcalf, Zima & Co., P.A.*, 925 F.2d 1398, 1399–1401 (11th Cir. 1991)).[5] The Eleventh Circuit construes the term "employer" liberally, to include joint employers. *Virgo*, 30 F.3d at 1359. Employers may also be liable for the discrimination of a separate corporation if that employer has succeeded the previous

---

[4] SSA appears to argue that the Court's treatment of PLC as a separate entity for purposes of the earlier motion to dismiss means that the Court should find the same here. To the extent this raises a *res judicata* argument, the Court is unpersuaded. Its findings for purposes of PLC's motion to dismiss have no impact on its findings in this Order given the different standards of review for motions made under Rule 12 and Rule 56.

[5] Discrimination claims under Title VII and § 1981 employ the same analytical framework and requirements. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.14 (11th Cir. 2011) (citing *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991)). The Court thus considers Plaintiff's discrimination claims together.

corporation through merger, acquisition or otherwise—dubbed successor liability. *In re Nat'l Airlines, Inc.*, 700 F.2d 695, 698 (11th Cir. 1983) (per curiam), *cert. denied sub nom. Gardner v. Pan Am. World Airways, Inc.*, 464 U.S. 933 (1983). Plaintiff contends that SSA should be liable as a joint employer or as a successor corporation. Neither theory helps her.

### 1.    Joint-Employer Liability

Two entities are joint employers if "the business entities involved are in fact separate but . . . they share or co-determine those matters governing the essential terms and conditions of employment." *Virgo*, 30 F.3d at 1360 (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). The doctrine applies when "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment" of the independent company's employees. *Id.* (finding sufficient evidence to show joint employment where a company that owned a hotel employed a separate management entity to operate the hotel but retained significant control over operations) (quoting *Browning-Ferris Indus.*, 691 F.2d at 1122). The existence of such a joint relationship is determined "by focusing on the entities' relationships to a given employee." *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1300 (11th Cir. 2016). Courts consider factors such as: "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Id.* (citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995); *Llampallas v. Mini-Cirs., Lab., Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998)).

Here, there is insufficient evidence that PLC and SSA jointly employed Plaintiff—even for a brief period. It is undisputed that SSA officially assumed management of Oak Grove on October 1, 2021. (Doc. 42-1 ¶ 12). And also that Plaintiff did not receive any paychecks from SSA before then. (*See* Doc. 42-2 ¶ 5); (*id.* ¶¶ 8–15). Yet Plaintiff maintains that SSA played an active role in the transition. (Doc. 44 at 4–5). She supports this only by pointing out that she signed her SSA New Hire Packet on September 6, 2021. (*See* Doc. 42-2 at 16–77). To be sure, this paperwork gave SSA the power to "hire, fire or discipline" her after SSA assumed control of Oak Grove. (*See id.*) But there is no evidence that the packet empowered SSA to hire, fire or discipline her as a <u>PLC</u> employee. (*See id.*)

Indeed, as Plaintiff's termination letter explains, SSA did not view Plaintiff as an employee until October 1, 2021. (Doc. 42-2 at 22) ("Tamar Brown joined the [SSA] Management team . . . on October 1, 2021. While Ms. Brown's tenure with the community was honored, her employment status . . . began on October 1, 2021."). Plaintiff has failed to adduce evidence, and the Court can find none, that SSA could exert any control over Plaintiff before October 1, for example, by compelling PLC to terminate or discipline her. In other words, SSA lacked the power to alter Plaintiff's employment relationship with PLC. (*See id.*) By the same token, there is no evidence that PLC exercised any control over Plaintiff's employment with SSA. Hence there is insufficient evidence that SSA had enough control over the terms of Plaintiff's employment with PLC to justify joint-employer liability.

## 2. Successor Liability

Generally, a successor corporation is not liable for the seller's debts and obligations without an express or implied agreement to assume those obligations. *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 821 (11th Cir. 1993)*, abrogated on other grounds by First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995); *see Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 172–85 (1973). This general rule, however, yields in the labor and employment context, where important policy concerns may justify liability for a successor. *See In re Nat'l Airlines, Inc.*, 700 F.2d at 698. Chiefly, "to prohibit employers who violated [labor and employment] laws from avoiding liability by selling, or otherwise disposing of, their assets and dissolving." *Hatfield v. A+ Nursetemps, Inc.*, 651 F. App'x 901, 906 (11th Cir. 2016) (citing *Teed v. Thomas & Betts Power Sols. LLC*, 711 F.3d 763, 768 (7th Cir. 2013)).

## a. Successorship Factors

Plaintiff invites the Court to employ the successor liability factors explained in *Desporte-Bryan v. Bank of Am.*, 147 F. Supp. 2d 1356, 1362 (S.D. Fla. 2001).[6] These factors have admittedly been influential on some district courts. *See, e.g., Simmons v. S. Power & Equip.,* LLC,

---

[6] Although SSA has not made specific arguments opposing successor liability, SSA contests liability for the actions of PLC, pointing to specific evidence that it is not sufficiently related to PLC. (*See* Doc. 42 at 3–5). So Plaintiff bears the burden to show a genuine issue for trial on SSA's liability for acts committed by PLC. *See Celotex*, 477 U.S. at 324. The Court thus addresses Plaintiff's argument for successor liability on its merits, even without articulated legal arguments against successor liability from Defendant. *See Zann v. Whidby*, 525 F. App'x 924, 924 (11th Cir. 2013) (per curiam).

No. 1:06-CV-1251, 2007 WL 9701681, at *1 (N.D. Ga. Feb. 2, 2007). Yet others have rejected them. *See EEOC v. Lab. Sols. of AL LLC*, 242 F. Supp. 3d 1267, 1273 (N.D. Ala. 2017); *EEOC v. Universal Diversified Enters. Inc.*, No. 1:18-CV-23573, 2019 WL 13255689, at *4 (S.D. Fla. Feb. 27, 2019). Such disagreement makes those factors unreliable guides. But more importantly, the *Desporte-Bryan* factors, although not inconsistent with Eleventh Circuit authority, obscure the relevant inquiry. The factors treat continuity of business operations as a contributing factor among many, even though the development of successor liability in this Circuit reflects that continuity is a threshold requirement.[7]

The Eleventh Circuit first recognized Title VII successor liability in *In re National Airlines*, 700 F.2d at 695–99. As that panel explained, a successor corporation is one "that takes the place of another corporation through merger, acquisition or otherwise[.]" *Id.* at 698. When determining whether such a corporation "should be held liable for unfair labor practices of its predecessor . . . . [A court] balances the interests of the employees and the employer and labor law generally." *Id.* (internal citations and emphasis omitted) (citing *Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd.*, 417 U.S. 249 (1974); *Golden State Bottling*, 414 U.S. at 168; *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272 (1972); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964)). The inquiry also includes "[s]uch factors as the extent to which the successor corporation essentially continues the operations of the former corporation and whether the new corporation had notice of the former corporation's practices[.]" *Id.* at 698 (citing *Golden State Bottling*, 414 U.S. at 171–74). Still, successor liability is a "fact specific" issue "and must be conducted 'in light of the facts of each case and the particular legal obligation . . . at issue.'" *Id.* (citing *Golden State Bottling*, 414 U.S. at 187 n.9).

Soon after, the Eleventh Circuit refined the successor liability analysis in *Evans Services, Inc. v. NLRB.*, 810 F.2d 1089 (11th Cir. 1987). Under *Evans Services*, "[a] finding of successorship . . . involves a two-step inquiry." *Id.* at 1092. First, a court "must find that the new business retains common aspects of the prior business sufficient to allow the legal conclusion of 'successorship.'" *Id.* Second, a court must find "that the successor knew of the unfair labor practices at the time it purchased the business." *Id.* In other words, unless a

---

[7] Notably, the focus of the inquiry in *Desporte-Bryan* was the "notice" requirement, rendering continuity of business operations less important to the *Desporte-Bryan* court's analysis than it is here.

plaintiff can show continuity in business operations, the extent to which a defendant had notice of the claim matters little. *See id.* So the Court does not treat continuity of business operations as only a contributing factor, but proceeds with the two-step successorship test from *Evans Services.*[8]

**b.    Continuity**

At the first step, the Court determines if a new employer retains sufficient common aspects of the prior employer. In *Evans Services*, the Eleventh Circuit employed the factors explained in *NLRB v. Jarm Enterprises,* which ask if the new employer: (1) continues the same business without substantial change, (2) employs substantially the same work force under the same conditions, (3) employs the same supervisors, and (4) offers the same service. *See Evans Servs.*, 810 F.2d at 1093; *Jarm*, 785 F.2d 195, 200 (7th Cir. 1986). Plaintiff contends there was sufficient continuity in business operations because the PLC employees who worked at Oak Grove continued in their positions as SSA employees. (Doc. 44 at 7). Yet Plaintiff casts the inquiry too narrowly—particularly as applied to her claims—because she confines the inquiry to operations at Oak Grove.

Granted, PLC and SSA both operated Oak Grove. But that is the extent of the overlap. SSA is a third-party property management company, which manages properties in Florida, Alabama, and Georgia. (Doc. 44-3 at 17). Jordan Cook, the SSA Divisional Director of Operations, manages at least eight senior-living communities. (*Id.* at 15–16). SSA assumes management of these communities through a combination of takeovers and establishing new communities. (*Id.* at 16). Although there is less evidence of PLC's operations, it appears to operate similarly—as a third-party property management company. (*See* Doc. 42-3 at 40–41). Upon the Record, Oak Grove was the only community whose management transferred from PLC to SSA. (*Id.* at 17). And, as SSA points out, and Plaintiff admits, "PLC and SSA have

---

[8] The only other relevant Eleventh Circuit case is *Hatfield*, 651 F. App'x at 901. In *Hatfield*, the panel analyzed successorship but did not employ the *Evans Services* two-step analysis. *See id.* at 764–65. Instead, the *Hatfield* panel employed the factor-based analysis from *Teed v. Thomas & Betts Power Solutions* which considers continuity of business operations as a factor, but not as a threshold matter. *Teed*, 711 F.3d at 764–65. The *Teed* factors, however, are consistent with *Evans Services*, and the Court will not abandon the two-step inquiry prescribed by a published opinion, for an unpublished decision relying on an out-of-circuit case. In any event, the continuity of business operations remained a key component of the *Hatfield* analysis, suggesting that it remains so.

11

different management, ownership, reporting structures, human resources departments, and billing departments." (Doc. 44-1 ¶ 6). Thus, in context, the management of Oak Grove represents a minor nexus between independent business operations. The two companies are, in all other substantial respects, entirely distinct.

Crucially, SSA replaced the PLC management employees who Plaintiff alleges were indifferent to her complaints. Indeed, SSA replaced all employees above Plaintiff with its own managers and executives. (*See* Doc. 42-2 ¶ 8). The discrimination that allegedly occurred on PLC's watch stems from the management decisions of PLC employees, such as Christopher Gill, Mark Starks, and Vialis Rodriguez. (*See e.g.*, Doc. 44 at 4). And the alleged discrimination that occurred on SSA's watch stems from the management decisions of SSA employees, such as Jordan Cook. (Doc. 44 at 4). This replacement of each employee responsible for Plaintiff's allegations against PLC is fatal to a continuity finding, which must be evaluated in light of the claims asserted. *See In re Nat'l Airlines*, 700 F.2d at 698.[9] If the Court were to hold SSA responsible for PLC management decisions, SSA would be liable for the decisions of employees of a distinct entity, whose decisions were made on behalf of that entity, and who SSA replaced upon the transfer. A fundamentally unfair result. There is thus insufficient evidence to find continuity of business operations between PLC and SSA. So Plaintiff's successorship argument fails, as a matter of law, at the first step.

### c.    Notice

Absent such continuity, notice has no impact—despite Plaintiff's contentions. To the extent there is sufficient evidence that SSA knew about Plaintiff's complaints to PLC, the Court agrees with Plaintiff. (*See* Doc. 44-2 at 9). For one thing, Tracy Smith wrote a letter to PLC management recounting alleged discrimination against Plaintiff. (*Id.*) From this, the Court may reasonably infer that the letter made it into the PLC employee records which SSA audited. (*See* Doc. 44-3 at 18–20). But, as a matter of law, and common sense, notice alone is not enough for successorship.

---

[9] To be clear, this analysis is tailored to Plaintiff's relationship to PLC and SSA. Although the Court does not find so, it is possible that a non-managerial employee at Oak Grove might have a stronger case for successor liability for purposes of a discrimination claim.

Notice is "critical" to be sure; because it "would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser . . . when the successor" lacked an opportunity "to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." *Desporte-Bryan*, 147 F. Supp. 2d at 1363 (quoting *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985)). For this reason, courts consider notice at the second step of the successorship inquiry. *See Evans Servs.*, 810 F.2d at 1093. But the Court cannot allow notice to obscure the threshold inquiry. In other words, notice is necessary, but not sufficient for successorship. So SSA's notice of the incidents during PLC management adds nothing to the successorship analysis here.

### 3.  Conclusion: Liability for Alleged PLC Discrimination

In sum, there is insufficient evidence to find either joint-employer liability or successor liability. Plaintiff has thus failed to show that SSA was an employer within the meaning of Title VII or § 1981 for alleged discrimination which occurred before October 1, 2021. As a result, only alleged actions which occurred after October 1, 2021, may sustain Plaintiff's claims. Specifically, Lindsay Clay calling Plaintiff a "whore," Jordan Cook's comment about Plaintiff's hair, and Plaintiff's termination by SSA.

### B.  Discrimination Claims

Turning to the alleged discrimination during SSA management, SSA moves for summary judgment on Plaintiff's Title VII and § 1981 discrimination claims, at Counts I and III. (Doc. 42 at 6–13). Both Title VII and 42 U.S.C. § 1981 prohibit employers from intentionally discriminating against employees based on membership of a protected class. 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981. As noted, Title VII and § 1981 apply the same burden of proof and analytical framework. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.14 (11th Cir. 2011). Under either statute, a plaintiff may use direct evidence, circumstantial evidence, or both, to prove discrimination. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023) (citing *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022)), *cert. denied*, 145 S. Ct. 154 (2024). Plaintiff supports her discrimination claims through circumstantial evidence here. (*See* Doc. 44 at 8).

To show discrimination through circumstantial evidence, Plaintiff has two options. *See Tynes*, 88 F.4th at 944–47. She may employ the *McDonnell Douglas* burden shifting framework.

*Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973)). Or she may otherwise present a "convincing mosaic of circumstantial evidence that would allow a jury to infer[] intentional discrimination by the decisionmaker." *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (alteration in original) (footnote omitted) (quoting *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)).[10] Defendant contends Plaintiff has failed to adduce sufficient evidence under either method. The Court agrees.

### 1.    McDonnell Douglas Framework

In *McDonnell Douglas*, the Supreme Court prescribed "a burden shifting framework designed to draw out the necessary evidence in employment discrimination cases." *Tynes*, 88 F.4th at 944 (citing *McDonnell Douglas*, 411 U.S. at 802). The framework has three steps. *Id.* First, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* She may do this by showing that (1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform her job, and (4) her employer treated "similarly situated" employees outside of her class more favorably. *See Lewis*, 918 F.3d at 1221 (quoting *McDonnell Douglas*, 411 U.S. at 802). If Plaintiff makes out a prima facie case, the burden shifts to SSA "to articulate a legitimate, nondiscriminatory reason for its actions." *See id.* (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). If SSA does so, the burden reverts to Plaintiff to show that SSA's "proffered reason was merely a pretext for unlawful discrimination[.]" *Id.* (alterations omitted) (quoting *Burdine*, 450 U.S. at 256). This obligation merges with Plaintiff's "ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Id.* (alteration in original).

SSA challenges the fourth element of Plaintiff's asserted prima facie case, contending that Plaintiff cannot show less favorable treatment than a similarly situated employee. (Doc. 42 at 8–9).[11] To prevail on her prima face case, Plaintiff "must show that she and her comparators

---

[10] *Tynes* clarified this issue recently, confirming that a court should not grant summary judgment solely for a plaintiff's failure to make out a case under *McDonnell Douglas*. *See Tynes*, 88 F.4th at 944–47.

[11] SSA also suggests that Plaintiff was not qualified for her position as Executive Director. (*See* Doc. 42 at 8). However, because this argument is couched as an "assumption" for purposes of argument, it is not properly raised. (*Id.*)

are 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1226. Ordinarily, such comparators "will (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; and (4) share the plaintiff's employment or disciplinary history." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1322 (11th Cir. 2023) (citing *Lewis*, 918 F.3d at 1227–28). Put differently, Plaintiff must show that she "and her comparators [are so] sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Lewis*, 918 F.3d at 1227.

Plaintiff misreads *Tynes* to suggest that the extent of material differences between employees is always a jury question. (*See* Doc. 44 at 12). This takes *Tynes* too far. Once a jury has found intentional discrimination, *Tynes* instructs that a court should not disturb that jury finding solely because a plaintiff has failed to identify a similarly situated employee. *See Tynes*, 88 F.4th at 944–47. The reason is that the *McDonnell Douglas* framework is not the only way to show intentional discrimination. *Id.* at 945. Instead, a jury may properly infer intentional discrimination from other circumstantial evidence. *Id.* at 946–47. *Tynes* does not, however, relieve a plaintiff seeking the benefit of the *McDonnell Douglas* framework from establishing its requirements. *See id.* at 947; *Lewis*, 918 F.3d at 1217. Indeed, if Plaintiff hopes to employ *McDonnell Douglas* to survive summary judgment, she must adduce sufficient evidence that she was treated differently from similarly situated employees. *Tynes*, 88 F.4th at 944–47. The Court may resolve this question as a matter of law. *See id.*

Plaintiff proffers Lindsay Clay as a similarly situated employee. (Doc. 44 at 10–13).[12] But no reasonable jury could find that Plaintiff and Ms. Clay were similarly situated for two reasons.

First, Plaintiff and Ms. Clay engaged in markedly different conduct. Plaintiff characterizes her termination for failing to communicate effectively as similar to Ms. Clay calling Plaintiff a "whore." (Doc. 44 at 11) (quoting Doc. 42-2 at 22). Yet there is little in

---

[12] Plaintiff also argues that Christina Reneau and Heath Reneau should be treated as similarly situated employees. (Doc. 44 at 10). Yet SSA did not employ Christina Reneau or Heath Reneau. (Doc. 42-1 ¶ 37). So without imputed liability, the extent of their material similarity to Plaintiff plays no role in her claims against SSA.

common between the two situations. SSA terminated Plaintiff because she allegedly "didn't know how to talk to people." (Doc. 42-3 at 96). Her termination letter describes a pattern of "[p]oor communication and interpersonal skills" which reflected a "fail[iure] to meet the expectations of management[.]" (Doc. 42-2 at 22). In other words, Plaintiff's failure to effectively communicate left her unable to perform her duties.

On the other hand, Ms. Clay made an allegedly racially-motivated comment to Plaintiff. (Doc. 42-3 at 84). Granted, Ms. Clay's comment was inappropriate, and it related to an interaction with a coworker. But the overlap ends there. Ms. Clay, through this single incident, did not apparently evince a failure to perform her duties to communicate effectively. These readily identifiable distinctions between Plaintiff and Ms. Clay's conduct make it hardly surprising that the two were treated differently.

Second, Plaintiff and Ms. Clay occupied distinct positions, with different employment history, supervisors and job expectations. As the Director of Sales, Ms. Clay reported directly to Plaintiff. (Doc. 42-3 at 53). In this role, Ms. Clay was responsible for "sales [and] business office functions[.]" (*Id.* at 120). These responsibilities were, of course, far narrower than those of the Executive Director. (*See* Doc. 42-2 at 17–21).

On the other hand, as the Executive Director, Plaintiff was responsible for "the overall management of Oak Grove[.]" (Doc. 42-3 at 52). Plaintiff directly supervised each department director at Oak Grove. (*Id.* at 52–53). During SSA's tenure, Plaintiff reported to Jordan Cook—the SSA Divisional Director of Operations. (Doc. 42-4 at 47). And Plaintiff's employment history was markedly different from Ms. Clay's. (*See* Doc. 42-3 at 34). There was thus little overlap between Ms. Clay's employment relationship with SSA and Plaintiff's.

Moreover, the other connections Plaintiff draws between her and Ms. Clay's employment relationships are weak. For example, Plaintiff argues that she and Ms. Clay were similarly situated because neither were disciplined while they worked at Oak Grove, and they were subject to SSA's employment policies. (Doc. 44 at 11). These characteristics, however, are of the type that are likely shared by significant numbers of SSA's employees, including many who work at Oak Grove, as well as employees at other SSA facilities. Such general characteristics add little.

Accordingly, there is insufficient evidence that Ms. Clay and Plaintiff were "similarly situated in all material respects" in light of the relevant factors. *See Lewis*, 918 F.3d at 1226; *Phillips*, 87 F.4th at 1322. And Plaintiff has not pointed to any other relevant comparator employee. Hence no reasonable jury could find that Plaintiff was treated less favorably than a similarly situated employee. Plaintiff's *McDonnell Douglas* prima facie case fails as a result.

## 2.    Convincing Mosaic

Without the benefit of the *McDonnell Douglas* framework, Plaintiff has one more option: to produce "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *See Tynes*, 88 F.4th at 946 (quotation marks omitted) (quoting *Smith*, 644 F.3d at 1327–28). Plaintiff may show "[a] 'convincing mosaic' . . . by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that [SSA's] justification is pretextual." *Lewis*, 934 F.3d at 1186 (alteration in original) (quoting *Silverman*, 637 F.3d 733–34). This evidence must allow a jury to reasonably infer that Plaintiff's protected characteristic was a but-for cause of SSA's intentional discrimination. *See Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1197 (11th Cir. 2024) (citing *Lewis*, 934 F.3d at 1185).

Plaintiff's mosaic has only three tiles:[13] (1) Mr. Cook's failure to investigate and discipline Ms. Clay, to Plaintiff's satisfaction, after the "whore" comment, (2) the temporal proximity of Plaintiff's report of the "whore" comment and her termination, and (3) the statement regarding Plaintiff's hair by Mr. Cook. (*See* Doc. 44 at 14–16). These facts alone, or taken together, are insufficient for a reasonable jury to infer that race was the but-for cause of Plaintiff's termination.

For the first tile, Mr. Cook's failure to discipline Ms. Clay is not the kind of differential treatment from which a reasonable jury could infer discrimination. Plaintiff is correct that the Court may consider treatment of a comparator employee for purposes of the convincing-mosaic standard even though that employee was not a "strict comparator[.]" *See Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022). Even so, as discussed, there is little in

---

[13] At least with respect to SSA's management, which is all that is relevant here.

common between Ms. Clay and Plaintiff. Therefore, myriad nondiscriminatory reasons might explain why the two employees were treated differently. Plaintiff has pointed to no evidence, beyond the fact that Ms. Clay was not disciplined, and Plaintiff was terminated, that permits the inference that their differential treatment was caused by race-based bias. Without such evidence, no reasonable jury could infer that the failure to discipline Ms. Clay showed discrimination.

Additionally, when evaluating a convincing mosaic, a plaintiff typically should produce evidence of *systematic* better treatment of similarly situated employees. *See Lewis*, 934 F.3d at 1186. The failure to adequately investigate or discipline a single employee for a single incident simply cannot be evidence of a systematic difference in treatment.

For the second tile, the Court is unpersuaded that the temporal proximity of Plaintiff's report of the "whore" comment and her termination is evidence of discrimination. Rather, it speaks to retaliation, which the Court examines below. In any event, the Court fails to see how SSA's supposed failure to investigate Ms. Clay and discipline her, even in light of Plaintiff's termination soon after, evinces discriminatory intent in Plaintiff's termination.

For the third tile, it is not reasonable to infer, from Mr. Cook's comment alone, that any subsequent decision he made in regard to a Black employee was discriminatory. To be sure, Mr. Cook's comment about Plaintiff's hair might evince prejudice. But it cannot alone color his every subsequent decision with discriminatory bias. Typically, such insensitive comments are more probative of a hostile work environment claim, than of a discrimination claim. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807–813 (11th Cir. 2010). And from this single comment—or Mr. Cook's failure to discipline Ms. Clay— it is not reasonable to generalize that any subsequent personnel decision Mr. Cook made was discriminatory.

Taken together, the Court does not find that these tiles—examined alone or observed together—could sustain a reasonable jury finding that Plaintiff's race was the but-for cause of her termination. So Plaintiff's attempt to show intentional discrimination through a convincing mosaic also fails.

### 3. Conclusion: Discrimination Claims

In sum, Plaintiff has failed to produce sufficient evidence to create a jury question under either *McDonnell Douglas*, or via a convincing mosaic of circumstantial evidence.

18

Accordingly, her discrimination claims fail as a matter of law. The Court therefore grants summary judgment on Plaintiff's Title VII and § 1981 discrimination claims.

### C.    Retaliation Claim

Next, Defendant SSA moves for summary judgment on Plaintiff's retaliation claims under Title VII and § 1981, at Counts II and IV. (Doc. 42 at 13–16). Title VII prohibits employers from retaliating against an "employee . . . [who] has opposed any practice made an unlawful employment practice [under Title VII]." 42 U.S.C. § 2000e-3(a). Section 1981 prohibits employers from retaliating against employees who oppose race-based discrimination. *Gogel v. Kia Mots. Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452–57 (2008) and *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Where a plaintiff seeks to show retaliation through circumstantial evidence, as Plaintiff does here, (*see* Doc. 42 at 13–16), courts analyze retaliation under an adapted formulation of the *McDonnell Douglas* framework. *See Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1337–38 (11th Cir. 2022) (citing *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) and *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021)).

Under this adapted framework, Plaintiff must first make out "a prima facie case, which raises a presumption that the employer's decision was more likely than not based upon an impermissible factor." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (quoting *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995)). The burden then shifts to SSA "to offer a legitimate, nondiscriminatory reason for its employment decision." *Johnson*, 948 F.3d at 1325 (citing *Richardson*, 71 F.3d at 805). Once SSA has offered such a reason, the burden reverts to plaintiff, to establish "that the reason offered by the defendant 'was not the real basis for the decision, but a pretext for discrimination.'" *Johnson*, 948 F.3d at 1325 (citing *Richardson*, 71 F.3d at 805).

### 1.    Prima Facie Case

Defendant argues that Plaintiff's prima facie case fails at the first element. (Doc. 42 at 13–17). To make out a prima facie case of retaliation, Plaintiff must show "(1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Patterson v. Ga. Pac., LLC*,

38 F.4th 1336, 1344–45 (11th Cir. 2022) (quoting *Gogel*, 967 F.3d at 1134). Plaintiff asserts that when she complained to Mr. Cook about Ms. Clay's "whore" comment, she engaged in statutorily protected activity. (Doc. 17 at 20). But, before addressing this assertion, the Court first discusses how it parses the circumstances of Plaintiff's report.

    a.    **The Circumstances of Plaintiff's Report**

To be clear, the Court rejects SSA's version of events—which effectively asks the Court to make a credibility judgment between Plaintiff's testimony about her report and Mr. Cook's subsequent letter to HR purporting to memorialize that report. (*See* Doc. 42 at 13–14). Such credibility judgments are improper. Indeed, even "a litigant's [sworn] self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)). Plaintiff vigorously disputes that Mr. Cook's letter to HR accurately memorializes her report, and she supports this dispute with specific references to relevant deposition testimony. (*See* Doc. 44-1 ¶¶ 52–57). Hence a genuine dispute remains about the circumstances of Plaintiff's report.[14] To the extent that Plaintiff's deposition testimony contradicts Mr. Cook's testimony, the Court accepts Plaintiff's testimony as true. *See Matsushita*, 475 U.S. at 587–88. Parsing the facts this way:

Ms. Clay made the "whore" comment in November 2021. (Doc. 42-1 ¶ 52). Later that month, Plaintiff brought the incident up during a one-on-one Microsoft Teams meeting with Mr. Cook. (Doc. 42-3 at 85–86). As Plaintiff testified:

> I reported to him this incident [sic]. And I told him that I felt discriminated against because of my - - race as a black American female, as an executive director. And I said it is - - it is out of line. It is very disrespectful. And I asked him to address it.

(*Id.* at 86).

Mr. Cook asked Plaintiff several questions, such as, "[w]ell, has she ever called anybody that that you are aware of?" (Doc. 42-3 at 86). Mr. Cook also "stated that he would address it." (*Id.*) Mr. Cook then suggested that Plaintiff and Ms. Clay meet for coffee outside of work "to discuss and resolve their differences" informally. (Doc. 42-3 at 89). After the meeting, Mr.

---

[14] Whether that dispute is material is a different question.

Cook sent a letter to HR purporting to memorialize the conversation. (Doc. 44-1 ¶ 64); (*see* Doc. 42-2 at 23). In response to the letter, HR reached out to Mr. Cook by phone to discuss the incident in more depth. (Doc. 44-3 at 34–35). Mr. Cook, however, did not testify as to the contents of that conversation with HR. (*See id.* at 34–35).

### b.    Protected Activity

Nevertheless, this evidence is not sufficient to establish protected activity. A person engages in statutorily protected activity if that person has "a good faith, reasonable belief that the employer was engaged in [an] unlawful employment practice[]." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (citing *Rollins v. State of Fla. Dep't of L. Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)). "[T]his burden includes both a subjective and an objective component." *Furcron v. Mail Cntrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citing *Little*, 103 F.3d at 960). Thus, Plaintiff must "not only show that she subjectively (i.e., in good faith) believed [SSA] was engaged in unlawful employment practices, but also that her 'belief was *objectively* reasonable in light of the facts and record present[ed].'" *Furcron*, 843 F.3d at 1311 (quoting *Little*, 103 F.3d at 960) (citing *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010)).

### i.    Subjective Belief

SSA does not meaningfully dispute Plaintiff's subjective belief that she was opposing discrimination. (*See* Doc. 42 at 13–14). And the Record reflects that Plaintiff plainly believed, in good faith, that she was reporting unlawful discrimination. (*See* Doc. 42-3 at 86). ("I told him that I felt discriminated against because of my - - race . . . ."). But Plaintiff's claim of protected activity stumbles at the second element: objective reasonableness.

### ii.    Objective Reasonableness

Objective reasonableness of a belief "is measured by reference to controlling substantive law." *Furcron*, 843 F.3d at 1311 (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)). A plaintiff, however, "is not required to prove that the discriminatory conduct complained of was actually unlawful." *Furcron*, 843 F.3d at 1311 (citing *Little*, 103 F.3d at 960). Rather, "the conduct opposed need only 'be close enough to support an objectively

reasonable belief that it is.'" *Furcron*, 843 F.3d at 1311 (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).[15]

Plaintiff has not produced sufficient evidence to meet this standard. "Title VII is not a federal 'civility code.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Instead, Title VII prohibits offensive comments in the workplace only if the "behavior [is] so objectively offensive" that it alters the conditions of a person's employment. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1335 (11th Cir. 2023) (citing *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1283 n.3, 1284 (11th Cir. 2018)). For this reason, a mere offensive utterance cannot rise to the level of unlawful discrimination unless a workplace is "permeated with discriminatory intimidation, ridicule and insult[.]" *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276–77 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Nevertheless, Plaintiff argues that she opposed a hostile work environment because she reported Ms. Clay's comment. But the "whore" comment alone does not amount to a Title VII violation. Not even close. At most, Ms. Clay's remark was an act of discrimination by a private individual. Notably absent from Plaintiff's report to Mr. Cook, was any other evidence that Oak Grove was "permeated with discriminatory intimidation, ridicule and insult." (*See* Doc. 42-3 at 86). Nor does the Record reflect that the comment had any appreciable impact on the conditions of Plaintiff's employment. (*See generally* Doc. 42-3). Indeed, when pressed on the subject, Plaintiff only described how her own experiences lead her to believe that the "whore" comment had racial undertones. (*See* Doc. 42-3 at 83) ("Q. Do you think that comment has anything to do with your race? A. I do because . . . as I left the community that day, in spite of all the tensions I had been previously feeling, it left me in a very difficult place as a leader . . . ."). At worst, Ms. Clay's comment was an offensive utterance. Such utterances do not rise to the level of unlawful discrimination. Therefore,

---

[15] The only unlawful discrimination that Plaintiff could be opposing here is a hostile work environment because Plaintiff, in her report to Mr. Cook, did not identify any adverse action that would form the basis of a Title VII discrimination claim. (*See* Doc. 42-3 at 84–86); *Tynes*, 88 F.4th at 946 ("A plaintiff who fails to prove . . . that she suffered an adverse employment action, will be unable to prove that she was unlawfully discriminated against."). The Court thus measures the objective reasonableness of Plaintiff's belief against the substantive law of a hostile work environment claim.

Plaintiff's subjective belief that she was reporting a hostile work environment was not objectively reasonable upon the Record.

Because Plaintiff has failed to produce sufficient evidence that she engaged in protected activity, her retaliation claims fail as a matter of law.[16] The Court thus grants summary judgment on Plaintiff's Title VII and § 1981 retaliation claims.

### D.    Hostile Work Environment Claim

Lastly, Defendant SSA moves for summary judgment on Plaintiff's hostile work environment claim. (Doc. 42 at 11–12). Admittedly, it is unclear whether Plaintiff asserts a hostile work environment claim at all. The Amended Complaint mentions it only in passing, (*see* Doc. 11 ¶ 49), and Plaintiff makes no arguments in support of that claim in her Response. (*See generally* Doc. 44). But the Court may not grant summary judgment based solely on a Plaintiff's failure to respond. *See United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1102–03 (11th Cir. 2004). Therefore, the Court evaluates Plaintiff's hostile work environment claim on its merits.

As alluded to above, Title VII "prohibits 'requiring people to work in a discriminatorily hostile or abusive environment.'" *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 774 (11th Cir. 2024) (quoting *Harris*, 510 U.S. at 21). To prevail on a hostile work environment claim, Plaintiff must show that (1) she "belongs to a protected group[,]" (2) she was "subject to unwelcome harassment[,]" (3) the harassment was "based on [her] protected characteristic[,]" (4) the harassment was so "severe or pervasive" that it altered "the terms or conditions of" her employment, and (5) her employer was "responsible for" the hostile work environment. *Id.* (quoting *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009)). SSA challenges the fourth prong.

"Showing that harassment is sufficiently severe or pervasive requires showing both a subjective and objective component." *Yelling*, 82 F.4th at 1335 (citing *Mendoza*, 195 F.3d at 1246). A court judges the objective severity of harassment "from the perspective of a

---

[16] To be sure, *McDonnell Douglas* is not the only way to survive summary judgment. *See Tynes*, 88 F.4th at 944–47. Even so, "a plaintiff's failure to prove a prima facie case under *McDonnell Douglas* 'often also reflects a failure of the overall evidence.'" *Copeland*, 97 F.4th at 782 n.8 (quoting *Tynes*, 88 F.4th at 944–45). That's the case here. Plaintiff has failed to adduce sufficient evidence that she engaged in protected activity—a fundamental requirement of a retaliation claim.

reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Id.* (quoting *Oncale*, 523 U.S. at 81). Relevant factors include "(1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than 'mere offensive utterance[s],' and (4) whether it unreasonably interfered with the employee's job performance." *Id.* (quoting *Allen*, 121 F.3d at 647).

Plaintiff's hostile work environment claim fails at its objective component. She relies on two incidents to show a hostile work environment: (1) Ms. Clay's "whore" comment, and (2) Mr. Cook's comment about her hair. Yet such incidents fall well-short of the required objective severity. These objected-to comments were infrequent—occurring only twice during Plaintiff's employment with SSA—and not particularly severe. *C.f. Miller*, 277 F.3d at 1276 (finding genuine dispute as to the existence of objectively hostile work environment where plaintiff had been called ethnic slurs three to four times a day); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254 (11th Cir. 2014) (finding genuine dispute as to the existence of an objectively hostile work environment when coworkers called Black plaintiff "boy" more than fifty times and another employee had called him "n-----"). There is also no evidence that the comments were made with the intent to humiliate. For example, although Plaintiff felt humiliated by Mr. Cook's comment, she described his intent as "passive-aggressive."(*See id.* at 89–91). What's more, the Court's review of the Record reveals that the two comments had little, if any, direct, tangible, impact on Plaintiff's job performance and certainly not to the degree that it would unreasonably interfere with that performance. [17] (*See generally id.*)

Consequently, no reasonable jury could find that the harassment was so objectively severe or pervasive that it altered the terms or conditions of Plaintiff's employment. Plaintiff's hostile work environment claim thus fails as a matter of law. Hence summary judgment is granted on Plaintiff's Hostile Work Environment claim—to the extent asserted.

## V.   CONCLUSION

To sum up, because Plaintiff has failed to produce sufficient evidence to find either joint-employer liability or successor liability, only claims of discrimination which occurred after

---

[17]Although Plaintiff testified that it "left her in a very difficult place as a leader[,]" the Court would need a more direct and tangible impact on Plaintiff's job performance to "unreasonably" interfere with it. *See Yelling*, 82 F.4th at 1335.

SSA assumed management are relevant to Plaintiff's claims. When considering only the relevant period, Plaintiff's claims fail as a matter of law.

First, Plaintiff's discrimination claims under Title VII and § 1981 fail because Ms. Clay and Plaintiff are not similarly situated enough to make out a prima facie case under *McDonnell Douglas*. And no reasonable jury could infer from Plaintiff's proffered mosaic of circumstantial evidence that SSA intentionally discriminated against her. Second, Plaintiff's retaliation claims under Title VII and § 1981 fail because, when she made her report to Mr. Cook, her belief that she was reporting discrimination was not objectively reasonable upon the Record. Lastly, Plaintiff's hostile work environment (to the extent asserted) fails because no reasonable jury could find that her colleagues' comments created an objectively hostile work environment. Consequently, Defendant SSA's Motion for Summary Judgment (Doc. 41) is **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant SSA and against Plaintiff.

**SO ORDERED**, this 3rd day of June 2025.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**